IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* TRECI MCNEIL,<br><br>Relator and Plaintiff,<br><br>versus<br><br>TARUN JOLLY; UTC LABORATORIES,<br>LLC d/b/a RENAISSANCE RX; BLUE OX<br>MEDICAL INNOVATIONS, LLC; RYAN<br>B. DIENST and TANYA THOMAS,<br><br>Defendants. | CIVIL ACTION NO. 4<br><br>**14 - 2247**<br><br>**SECT. N MAG. 3**<br>**FALSE CLAIMS ACT COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL**<br><br>**FILED IN CAMERA AND**<br>**UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(B)(2)** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Treci McNeil ("Relator") brings this action in the name of and on behalf of the United States of America ("United States") for treble damages and civil penalties arising from the conduct of Defendants Tarun Jolly (hereinafter referred to as "Jolly"); UTC Laboratories, LLC (hereinafter referred to as "UTC") d/b/a Renaissance Rx (hereinafter referred to as "Renaissance"); Blue Ox Medical Innovations, LLC (hereinafter referred to as "Blue Ox"); Ryan Dienst and Tanya Thomas [sometimes collectively referred to as "Defendants"] in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), the Anti-Kickback Act, 42 U.S.C. §1320a-7b, and the Stark laws, 42 U.S.C.A.§1395nn. The violations arise out of false claims for payment made to Medicare.

## SUMMARY OF THE SCHEME

1. Physicians seeking financial gains received kickbacks for agreeing to and participating in a "research study" for Medicare patients consisting of DNA testing to determine how a patient metabolizes medicines and toxicology screening to confirm whether a patient is

1

abusing medications.  Although neither the doctor nor his staff performed any work or service with regard to the testing, the doctor received an illegal cash payment for every patient tested. These physicians allowed laboratory staff members to select the patients to be tested, to mislead their patients as to the usefulness of and rationale for the testing, to waive or fail to collect any co-payments or deductibles and to conduct the testing.  Test "results" that were provided to the physicians had limited or no usefulness in treating patients.  The DNA testing was not part of a research study and Medicare did not approve payment for "research testing."

## BACKGROUND

2.     Tarun Jolly, a Louisiana physician and pain doctor, went into the laboratory testing business in 2012 while continuing to practice medicine.  Jolly's laboratory, UTC, has experienced "intense, crazy growth"[1] because of the illegal sales tactics and scheme to defraud Medicare.

3.     UTC has grown from 3 employees in 2012 to more than 800 employees in 44 States in less than two years.  UTC "processes" between 1,200 and 1,600[2] DNA tests daily. Each DNA test is billed to Medicare at $2,000 per DNA test.[3]  Frequently, Jolly's testing charges are compounded because a "toxicology" screen is also performed at an additional cost to Medicare of $750 per test.

---

[1] Tarun Jolly was quoted as making this statement in May 2014.  http://www.nola.com/business/index.ssf/2014/05/new_orleans_firm_doing_dna_tes.html

[2] This number may have increased as sales now include 45 States.

[3] The number of tests processed represents Medicare, private insurance and self-pay patients.  It is estimated that 60% of all patients tested are Medicare patients.  This amount has varied slightly since the inception of the scheme.

4.      The source of this "too good to be true" explosion has been illegal kickbacks, medically unnecessary testing of Medicare patients and failure to charge for deductibles and copayments.

5.      As alleged herein, beginning in or about 2012, Jolly caused thousands of false claims to be made on Medicare and other health care programs. Defendants UTC, Renaissance, Blue OX and the individual defendants accomplished this by (a) engaging in a systematic program of "kickbacks" to physicians who then allowed Renaissance, UTC and Blue OX to perform medically unnecessary DNA and toxicological testing on their patients; (b) subjecting Medicare patients to unnecessary medical testing while inducing the patients to submit to testing by agreeing to and, in fact, waiving and not collecting deductibles or copayments for the testing; (c) planting "medical assistants" in every "partner" physicians' practice where the medical assistants screen every patient for testing based on the physician's daily appointment lists and testing patients without physician input;[4] (d) fraudulently billing for services that were not medically necessary; (e) submitting false statements and billings concealing violations of the anti-Kickback laws.

6.      These illegal actions and resulting false claims caused the government to pay out funds that they otherwise would not have paid and unlawfully enriched Defendants.

---

[4]  Until late August 2014, at least in North Carolina, there was not even the pretense that physicians were ordering the testing. UTC employees called "medical assistants" or "MA"s printed the patient list, highlighted "qualified" patients after reviewing their charts and noted those patients who had been tested previously. "Qualified" meant that the patient had Medicare and not Medicaid, and that his/her insurance covered the test. Because one of the asserted purposes of the DNA test is to reveal drug interactions, UTC provided "guidelines" intended to deceive the public, patients and the government. Those guidelines required that patients be prescreened and certified for DNA testing only if they were taking 3 or more medications. In order to qualify and test the largest number of patients, however, UTC directed MAs/collectors to ignore the three medication requirement and to falsify medical records by adding drugs that were not taken by the patient, or to accept vitamins, caffeine (coffee or tea) or other over-the-counter and household remedies as "medications" for qualification purposes.

3

7.     Relator is an "original source" of the information upon which this Complaint is based, as that term is used in the False Claims Act.

8.     The facts and circumstances alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, or in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

## FEDERAL JURISDICTION AND VENUE

9.     This court has jurisdiction over this civil action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367 and 31 U.S.C. §3732.

10.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391, because Defendant Tarun Jolly resides in the district.

11.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendants do business in New Orleans, Louisiana. The Defendants transact business in the Eastern District of Louisiana and most of the acts and omissions proscribed by 31 U.S.C. §3729 *et seq.*, occurred in this State.

12.     The DNA and toxicology test processing, as described herein, is completed by UTC in the district and upon information and belief, all billing to Medicare is originated in this district.[5]

/ / /

/ / /

/ / /

---

[5]   Renaissance RX has employees located all over the country (45 States & growing), but Renaissance RX's Laboratories and Corporate Office are located at the New Orleans BioInnovation Center. http://renrx.com/PageDisplay.asp?p1=16358

4

## PARTIES

13.     The United States funds the provision of medical care through Government Healthcare Programs including Medicare acting through the Centers for Medicare & Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS") and other federal agencies.

14.     Relator, Treci McNeil, is a health care provider with experience working in home healthcare and for physician practices.  She was hired by UTC initially as a Medical Assistant ("MA") and was later promoted to a supervisory position responsible for supervising the MAs in physician offices in her area.  Her title was "head medical assistant."  She was later titled an "implementation specialist."

15.     Relator lives in North Carolina. Relator was terminated from her job at UTC/ Renaissance Rx on or about August 29, 2014 after repeatedly questioning her employers about the misrepresentations regarding a research study, fraudulent billing and other issues related to the scheme.

16.     Defendant UTC Laboratories, LLC d/b/a Renaissance Rx's principal place of business is 1441 Canal Street, Suite 401, New Orleans, Louisiana.  UTC is a Louisiana Limited Liability Company whose Registered Agent is Tarun Jolly with a listed address of 36 Versailles Blvd., New Orleans, Louisiana, 70125.  Jolly is also the Managing member of UTC.

17.     Defendant Tarun Jolly is, upon information and belief, a resident of New Orleans, Louisiana and can be served at 36 Versailles Blvd., New Orleans, Louisiana, 70125.

18.     Blue Ox Medical Innovations, LLC is a North Carolina limited liability company which operated on behalf of UTC/Renaissance in North Carolina.  Blue Ox's registered agent and manager is and was Ryan B. Dienst whose "office" address is 3341 Leamington Lane,

5

Charlotte, NC 28226-6658.  The principal office of Blue Ox is located at 1927 S. Tryon Street, Suite 310, Charlotte, North Carolina.

19.     Ryan B. Dienst[6] is and was an Area Vice President for Renaissance Rx, and is and was responsible for the "marketing" and sales of UTC/Renaissance RX's DNA and toxicology testing in North Carolina and other states.  He is and was the direct supervisor of Defendant Tanya Thomas to whom Relator reported.

20.     Tanya Thomas (hereinafter referred to as "Thomas") is and was the Senior District Sales Manager for Renaissance Rx, Blue Ox and UTC in the North Carolina region.[7] She was responsible for engaging physicians as partners in the testing, and persuading them to allow MAs into their practice.  Tanya Thomas also paid kickbacks to those physicians as directed by the defendants for each patient tested and was the "go to person" when a participating physician or practice complained about nonpayment or other issues.

### INDIVIDUAL PARTICIPANTS

21.     Daniel Riley is responsible for the hiring of all sales representatives for UTC/ Renaissance Rx in North Carolina.

22.     Carter Anderson is the Renaissance Rx District Manager for Raleigh, North Carolina area.

23.     Maegan Maloney, an employee of Renaissance Rx, was assigned in August 2014 as the "Implementation Specialist" who began to take over the supervision of MAs in the North Carolina area.

---

[6]  https://www.linkedin.com/in/rdienst

[7]  https://www.linkedin.com/pub/tanya-thomas/99/4b7/592

24.     Sara Miranda is another "Implementation Specialist" for Renaissance Rx in the North Carolina area. Rebecca Johnson, Jill Chmil, Minda Daniels and Kim Lapeirre are among the sales representatives who induced physicians and their offices to join the laboratory testing scheme.

25.     The many physicians (and medical practices) who participated in the scheme include, but are not limited to:

        a.       Carolina NeuroSurgery & Spine Associates;

        b.       Randy O. Kritzer, MD (Physiatrist) North Carolina;

        c.       Paul C. Harkins, PhD, MD (Pain Management) North Carolina;

        d.       Gary P. Cram, Jr., MD (Neurosurgery) North Carolina;

        e.       Robert Bloomfield, MD (Internal Medicine) North Carolina;

        f.       Lake Jeanette Urgent Care, 1309 Lees Chapel Road, Greensboro, NC 27455;

        g.       Elizabeth Dewey, MD, 3820 N. Elm Street, Suite 104, Greensboro, NC 27455;

        h.       Jason Leonard, MD (family practice) with clinics in South Carolina;

        i.       Blowing Rock Medical Center;

        j.       Ardmore Family Practice, Winston Salem, NC;

        k.       Randleman Medical (Regina York, PA);

        l.       Dr. Roy Moreira, MD, Greensboro, NC;

        m.       Medical Associates, Greensboro, NC;

        n.       Northwest Medical Partners, Mt. Airy, NC;

        o.       Dr. Joseph D. Barker, Newland, NC;

        p.       Catawba Valley Behavioral Health; NC;

    q.      Nova Medical Center, Greensboro, NC;

    r.      TMS of the Triad, Greensboro, NC (Irving A. Lugo, MD);

    s.      Collettsville Medical Center;

    t.      Happy Valley Medical Center; and

    u.      Jason Leonard, MD, Sumter, S.C.

26.     There are hundreds or perhaps thousands of other physicians and physician practices involved in this scheme throughout the United States.

## FEDERAL FALSE CLAIMS ACT

27.     The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of Government fraud to disclose the information without fear of reprisal or Government inaction and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the burden on the government and Relator in investigating and prosecuting *qui tam* suits under the FCA.

28.     The False Claims Act generally provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and

statements material to a false claim, or conspires to engage in such conduct, is liable for a civil penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Federal Government.

29.     The FCA defines the term "knowingly" to include actual knowledge, actions in deliberate ignorance of the truth or falsity of the information or acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is required. 31 U.S.C. §3729 (b)(1)(A) and (B).

30.     The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. Based on these provisions, Relator seeks, through this action, to recover all *available* damages, civil penalties, and other relief for the federal violations alleged herein.

## THE ANTI-KICKBACK STATUTE

31.     The federal healthcare Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health *care de*cisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

32.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or *arranging* for the purchase of any item or service for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b (b). Under this statute companies and persons may not offer, pay or solicit to receive, any remuneration, in cash or kind, directly or indirectly, to

9

induce hospitals, physicians or other health service providers to order, recommend or arrange for the purchase or lease of any item or service that may be paid for by a federal health care program. The law not only prohibits outright bribes and rebate schemes, but also prohibits any payment by a company that has, as one of its purposes, inducement of a physician to request or bill for additional services or products provided by the company.

33.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, *and impr*isonment. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).

34.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicare federal healthcare program. With r*egard t*o Medicare, all providers and suppliers must complete a Medicare enrollment form before receiving payments from the programs. The following forms must be completed and submitted to the applicant's proper Medicare Contractor in their given region: (a) provider entities complete the CMS Form 855A to enroll in Medicare Part A; (b) supplier entities (*e.g.,* clinics and group practices) complete the CMS Form 855B to enroll in Medicare Part B; and (c) individuals (*e.g.,* physicians and other practitioners) complete CMS Form 855I. All three CMS 855 forms contain *a mater*ially identical certification that the applicant agrees to abide by all Medicare laws, including the anti-*kickback* statute and that payment is conditioned upon compliance with these statutes and regulations. The Certifications specifically state: "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare." *See* CMS 855A at 37; 855B at 30; 855I at 25.

10

35.     In sum, either pursuant to provider agreements, claims forms, or other appropriate manner, laboratories and physicians who participate in federal health care programs generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback law.

36.     Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. §1320a-7(a)(l).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. §1320a-7(b).

37.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare and other federal health care programs.  Reimbursement is also prohibited by the general legal principle that providers who are corrupt or unethical or violate the integrity of a government program involving government funds are not entitled to payment from the public treasury for the resulting claims.

## FACTUAL BASIS FOR FALSE CLAIMS

38.     In 2012 Tarun Jolly created a company to conduct DNA and toxicology testing ostensibly to report to physicians whether a pain patient was abusing his medications and to determine what drugs were in a patient's system to avoid drug interactions.

11

39.    Jolly, who is 38 years old, had operated a chain of pain clinics in Louisiana at the time he started his "laboratory" known as UTC/ Renaissance Rx[8].

40.    The reports provided by Defendants claim to show broad categories of how a patient metabolizes medications.  The DNA testing conducted by UTC is called Cytochrome P450 Metabolism testing.  The reports provided to physicians allegedly predict the nature of the patients' metabolism in terms of poor, intermediate, extensive and rapid/ultra rapid.

41.    In order to obtain the participation of hundreds of doctors in States all over the country, Jolly hired the individual defendants and others to create a "marketing" scheme that incentivized physicians to use the testing by paying doctors cash[9] for each patient tested.  Relator states that doctors received a cash payment for each patient that received a DNA test with an additional payment for the toxicology testing.

42.    The defendant's "marketing and IS department" hired managers and sales representatives who had historical relationships with physicians and in that manner gained entry into their offices.  Once invited to provide a presentation, Renaissance Rx employees sold the physicians on the testing, agreed to provide all of the equipment and manpower to administer the tests and to provide a profit incentive (kickback) to the physicians.  The doctors and their staff performed no work for their incentives, did not prescreen or approve any patients for testing, and were paid entirely for providing Defendants' access to their patients.

43.    When a physician agreed to engage in the scheme the defendants provided an MA or collector for the physicians' office.[10]  The MA's job was to obtain access to every patient file

---

[8] News articles suggest that Jolly has two partners in UTC: Barry Griffith and Patrick Ridgeway.
[9] Checks were issued for these "cash payments."
[10] These MAs were obtained through an apparently unrelated medical staffing company, CPR Medical Staffing.  http://www.cpr-inc.com/

in the office and to acquire the list of patients scheduled to be seen every day.

44.    Upon obtaining the daily list, the MA, who had direct access to patient files, would determine whether the patient was on Medicare or other insurance that covers the DNA testing. The MA would highlight all Medicare patients (and patients' whose insurance would pay for the testing) on the list. If the patient had already been tested the letters "AS" would be posted to the list. The "AS" stood for already seen.

45.    Every patient who was "eligible" as described above would be seen by the MA, normally before the physician even saw the list of that day's patients. The MAs met with the patients, explained the tests and obtained patient "consent" after determining whether the patient was taking any prescribed or over-the-counter medications, and performed the test. The physicians did not talk to the patients about the need for testing or determine medical necessity prior to testing.

46.    MA/collectors were directed by Defendants to ignore the three medication testing guidelines and to falsify patient medical records so that patients would qualify for DNA testing. This fraud was intended to "substantiate" medical necessity. In one North Carolina physician's office, the MA added medications to a patient's pretest screening knowing that the patients were neither prescribed nor taking the medications. Tanya Thomas encouraged this practice and the list of the most frequent "add-ons" was nicknamed "the top 7." MAs/collectors were encouraged by Defendants to "add-on" to a patient's prequalification medications such as Hydrocodone, Tramidol, Flexiril, Valium, Xanax, Percocet and Oxicotin. Thomas justified this falsification by telling the Relator and MAs that when and if the physician ever put patients on these common medications, the doctor would know how the patient would react metabolically.

47.    Patients who were not taking any medications were nonetheless tested so that MAs could meet the testing quotas set by Renaissance and so that physicians could earn

13

additional kickback payments. Carolina NeuroSurgery & Spine Associates, for example, was one of the practices where patients who were not taking prescription or other medications were routinely tested. These tests served no medical purpose at all.

48. At Randleman Medical Center, 702 S. Main Street, Randleman, NC, a Physicians' Assistant, directed that every patient in the office be tested. That PA advised that she never utilized the DNA test results for any purpose.

49. To the extent that the DNA test may arguably have some value for analyzing potential drug interactions, the DNA test has no value for a patient not taking medications. The toxicology screen is equally without value to a patient or physician when no medications or drugs are being taken.

50. Renaissance Rx directed their MA/collectors to: (1) educate the patient by telling them about the test; (2) discuss billing Medicare and advising patients that they did not "qualify" for the testing if they had a Health Savings Account, Flex Spending Account or certain insurance. Patient consent for the testing was obtained by the MA and not the physician. Neither the physicians nor their staff selected, screened, or obtained consent from the patient.

51. Renaissance Rx personnel swabbed patients without regard to medical necessity. Testing Medicare patients who did not take medications was so prevalent that a memo reminded the MAs that Renaissance "RECOMMENDED" testing patients who took medications. The May 15, 2014, Memorandum called "Billing Updates / Cheat Sheet" provided in pertinent part:

> It is also RECOMMENDED that you focus testing on patients that
> are on medications and need the testing (i.e. do not run full panels
> on someone on zero medications!)
> [Emphasis in original.]

52. Relator states that Medicare was billed at $2,000 per DNA test and $750 for a toxicology test. Self-paying patients were charged a reduced rate of $600 for DNA testing and

14

$95 for Toxicology testing. These reduced prices are seemingly a violation of Medicare best pricing rules.

53.     Although Medicare and other patients were legally required to pay any applicable deductibles and copayments, Renaissance Rx did not collect these payments. Patients were advised by MAs that although a bill might be sent, they need not pay the bill and no attempts to collect would be undertaken.

54.     Every patient who asked about the co-payment/deductible was told by the MA that if they received a bill, they should ignore it because Renaissance Rx would never try to collect the monies owed.

55.     Relator states that Renaissance never attempted to collect co-pays, deductibles or unpaid test costs from a patient or insurer.

56.     Physicians documented kickback payments owed to them by using an automated "portal" which transmitted the information to Defendants.

57.     Physician kickbacks were paid by management and not the sales staff or the MA/collectors. When the kickbacks were offered and paid, the defendants were aware that their conduct was illegal.

58.     Relator overheard four conversations between physicians and management personnel regarding the tardy payment of kickbacks. Two of the conversations involved Rebecca Johnson and physician "partners" and the others were between the physicians and Defendant Tanya Thomas. Each kickback discussion involved a different physician and practice.

59.     During each kickback conversation overheard by Relator, Renaissance management personnel assured the physician that his "check" would be issued shortly.

60.     The physician kickbacks are so engrained in the Renaissance culture that Tanya Thomas and others alluded to them in written communications.

15

61.    An example of written communications concerning the kickback scheme was a memorandum written by Tanya Thomas, a Territory Manager at the time, and Jill Chmil, Account Manager.   The memorandum was sent to all MA/collectors who worked in individual physician practice offices.   The intent of the memorandum was to encourage Defendants' MA/ swab collectors to arrive at their designated physician offices on-time every day so that they could maximize the number of DNA swabs collected.   An additional reason given by Tanya Thomas and Jill Chmil for timely arrival at work was to ensure that the doctors could collect maximum kickbacks.   They wrote in their memo to these staff members:

> ...Being late results in a snowball effect of patients missed, **physicians losing money as a result of missing swabs,** you getting behind in your work ...
> [Emphasis supplied.]

62.    Tanya Thomas also provided written assurance to one physicians' group that they would get the "checks" they were "owed" for patients that had already been tested.   This E-mail was unusual because it was written to the only physician's office that Relator knows was dropped from the scheme.   The office was terminated by Defendants because one of the doctors wanted to have a personal relationship with Tanya Thomas, who rejected his attentions.   Tanya Thomas decided to drop the physician, his partners and their office from the scheme because of the perceived harassment.    In her email to Robin Young, office manager for Carolina NeuroSurgery & Spine Associates, dated August 13, 2014, Thomas wrote:

> We will follow through to provide all results to each physician, **will provide research payment for all ecrfs** as Tameka wraps those up, and will continue portal availability.   [Emphasis supplied. Ecrf apparently refers to electronic case report form.]

63.    Each MA had a daily quota and was threatened with job loss if they did not obtain sufficient daily patient "swabs."   The quota was 8 swabs per day (one per hour worked during the work week) but employees were expected to exceed this minimum requirement.

16

64.    Relator states that MAs were directed to target and swab all Medicare patients. Northwest Medical Partners is an example of an office that tested every Medicare patient.

65.    When Relator was an MA she swabbed approximately 27 patients per day.

66.    One of the MAs in Relator's area averaged 40-70 swabs per day at her assigned office in Mt. Aires, North Carolina.

67.    Physicians receive reports for each patient swabbed, reflecting one of four "metabolizer" categories: poor, intermediate, rapid or ultra-rapid.

68.    An email sent from Ryan Dienst to "Entire Sales Team" to include collectors, sales and "IS" demonstrates that physicians were not involved in making the decision to test a patient or discussing these tests. In that email, dated August 9, 2014, Dienst discussed **changes** in the way business would be done in the future. This highlighted that it was being done illegally from inception until at least August 2014.

69.    As part of the email, Dienst confessed that physicians were not discussing the testing with patients or getting patient consent for the tests, and that only the MA/collectors were making decisions regarding medical necessity. He also conceded that it was the collector/MAs who decided which patients would be tested. He asserted in this email that the NEW process should actually include the physicians.

70.    Dienst wrote on August 9, 2014:

- Consent Shift – Consenting has been done different ways in different offices. This is due to the ideal process changing over time and the unique characteristics of each process. The plan *going forward* is that the consenting process has to happen AFTER a provider has talked with a patient about the test and research. In the old talk track/process, the collectors discussed these items with the patient. …

- Push for Clinical Relevancy - … Patient identification must come from the provider and is a conversation sales/IS needs to have with each provider/ practice if this hasn't been done yet.

17

71.     On or about August 20, 2014, the MAs were told to adopt the new protocol to "meet compliance", but the pressure to meet the quota of at least 40 swabs per week, as a practical matter, encouraged the continued use of the old procedures and the continued testing patients without physician input regarding medical necessity.

72.     On September 17, 2014, an MA was fired who subsequently told Relator that the August email from Dienst was ignored and she continued to test every Medicare patient without any physician input.

73.     After Relator was terminated, Defendants added an additional variation on the fraudulent scheme.   Relator was told that in a telephone conference during the week of September 8, 2014, Defendant Thomas directed her entire staff of Supervisors and MAs to bill Medicare as the primary insurer even when Medicare was the secondary insurance for billing. Thomas further directed the staff of Renaissance Rx that they were to make the actual primary insurer appear to be secondary.

## CAUSES OF ACTION

### First Cause Of Action
### False Claims Act
### 31 U.S.C. §3729(a)(1)(A)(2010)

74.     Plaintiff/Relator repeats and realleges each allegation contained in paragraphs numbered 1 through 73 above as if fully set forth herein.

75.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

76.     Defendants, individually and by and through their officers, agents, members, employees, related companies, subsidiaries, contractors and patients, knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A)(2010).

77.    Defendants, individually and by and through their officers, agents, members, employees, and contractors authorized and encouraged the actions of their various officers, agents, and employees to take the actions set forth above and/or acted in deliberate ignorance of the truth or falsity of the information and/or in reckless disregard of the truth or falsity of the information.

78.    As a result of the acts of Defendants, the United States Government reimbursed the Defendants for testing for which it would not have otherwise have paid.

79.    Every statement, billing and claim for payment submitted to Medicare and the other federal health insurance programs for each and every DNA and toxicology test represents a false or fraudulent claim for payment.

80.    It is estimated that hundreds of thousands of such false claims were submitted by Defendants since 2012.

81.    By reason of Defendants' acts the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Medicare has paid for patient laboratory tests that were not medically necessary and incurred costs that they otherwise would not have paid for but for Defendants' fraudulent and illegal conduct.  The unnecessary and ineffective testing of these patients and the corresponding claims to Medicare and other federally-funded health care programs were a foreseeable and intended result of Defendants' illegal acts.

82.    As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. § 3729 *et seq.* and have thereby damaged the United States Government.

83.    The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim submitted, paid or approved.

19

WHEREFORE, Relator respectfully requests this Court enter judgment against the Defendants and each of them as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that Defendant(s) caused to be presented to the Government under the Federal False Claims Act;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

(d)    That Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)    That the Court award such other and further relief as it deems proper.

### Second Cause Of Action

#### False Claims Act—False Records and Statements
#### 31 U.S.C. §3729(a)(1)(B)(2010)

84.    Plaintiff/Relator repeats and realleges each allegation contained in paragraphs 1 through 73 above as if fully set forth herein.

85.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

86.    Defendants by and through their officers, agents, members, employees, related companies, subsidiaries, contractors and customers, by virtue of the acts described above, and for the purpose of defrauding the Government, knowingly made, used and/or caused to be made or used, false or fraudulent records or statements to get false and fraudulent claims paid or approved, within the meaning and in violation of 31 U.S.C. § 3729(a)(1)(B)(2010).

20

87.     Defendants, individually and by and through their officers, agents, members, partners and employees, authorized and encouraged the actions of their various officers, agents, contractors, members and employees to take the actions set forth above and/or acted in deliberate ignorance of the truth or falsity of the information and/or in reckless disregard of the truth or falsity of the information.

88.     By reason of Defendants' acts and omissions, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants and each of them, as follows:

(a)     That the United States be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)     That civil penalties of $11,000 be imposed for each and every false claim (including records and statements) that Defendants fabricated or caused to be presented to the Government and its military under the Federal False Claims Act;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

(d)     That Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)     That the Court award such other and further relief as it deems proper.

/ / /

/ / /

### Third Cause of Action

## ANTI-KICKBACK STATUTE VIOLATIONS
## 42 U.S.C. §1320a-7a

89.     Relator repeats and realleges each allegation contained in paragraphs 1 through 73, above as if fully set forth herein.

90.     This is a claim for damages and penalties under the Anti-Kickback Law, 42 U.S.C. § 1320a-7a and 7b.

91.     Defendants, individually and by and through their officers, agents, members, partners, employees, related companies, subsidiaries and holding companies, knowingly:

      a.     Presented or caused to be presented to the United States a claim for medical or laboratory testing and service that was not provided as claimed; and/or

      b.     Presented or caused to be presented to the United States a claim for medical or laboratory testing or service which is false or fraudulent; and/or

      c.     Presented or caused to be presented to the United States a claim for medical or laboratory testing or service that was not medically necessary; and/or

      d.     Committed an act in violation of §1320a-7b(b); and/or

      e.     Made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a federal health care program.

92.     Defendants, individually and by and through their officers, agents, members, partners and employees, authorized and encouraged the actions of its various officers, agents, members, partners and employees to take the actions set forth above.

93.     As a result of the acts and omissions of Defendants, the United States Government reimbursed Defendants, physicians and healthcare providers items and services that

it otherwise would not have paid had Defendants not committed the acts outlined in this Complaint.

94.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial. Medicare has paid numerous claims for services provided by Defendants and entities prohibited by the Anti-Kickback Statute. These prohibited claims to federally funded health care programs were a foreseeable and intended result of Defendants' illegal acts.

95.    As set forth in the preceding paragraphs, Defendants have knowingly violated 42 U.S.C. § 1320a *et seq.* by paying kickbacks to physicians and failing to collect co-payments and deductibles from patients as required by law and in other ways described herein and thereby damaged the United States Government. The United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty of not more than $15,000 for each prohibited claim paid or approved, and not more than $100,000 for each arrangement or scheme.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants, and each of them, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the prohibited referrals as alleged within this Complaint and other misconduct identified herein in violation of 42 U.S.C. § 1320a-7a and 7b(b);

(b)    That civil penalties of $15,000 be imposed for each and every prohibited bill or claim that Defendants caused to be presented to Medicare and other Government Healthcare Programs under the law;

(c)     That other civil sanctions and penalties be imposed including reimbursement for all payments made in violation of the Anti-Kickback Law, $100,000 for the scheme and $10,000 per day for failure to report;

(d)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(e)     That the Relator be awarded the maximum amount allowed pursuant to the Anti-Kickback Law and Federal False Claims Act; and

(f)     That the Court award such other and further relief as it deems proper.

### Fourth Cause of Action

**False Claims Act—Conspiracy ---False Records and Statements**
**31 U.S.C. §3729(a)(1)(B)(2010)**

96.     Plaintiff/Relator repeats and realleges each allegation contained in paragraphs 1 through 73 above as if fully set forth herein.

97.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

98.     Defendants by and through their officers, agents, members, employees, related companies, subsidiaries, contractors and customers, by virtue of the acts described above, and for the purpose of defrauding the Government, conspired with each other and with physicians and physician practices, known and unknown, to knowingly make, use and/or cause to be made or used, false or fraudulent records or statements to get false and fraudulent claims paid or approved, within the meaning and in violation of 31 U.S.C. § 3729(a)(1)(B)(2010).

99.     Defendants, individually and by and through their officers, agents, members, partners and employees, authorized and encouraged the actions of their various officers, agents,

24

contractors, members, employees and co-conspirators to take the actions set forth above and/or acted in deliberate ignorance of the truth or falsity of the information and/or in reckless disregard of the truth or falsity of the information.

100.    By reason of Defendants' acts and omissions, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants and each of them, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims made by the Defendants and their co-conspirators as alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim (including records and statements) that Defendants fabricated or caused to be presented to the Government and its military under the Federal False Claims Act;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

(d)    That Relator be awarded the maximum amount allowed pursuant to the Federal False Claims Act; and

(e)    That the Court award such other and further relief as to the court seems just and proper.

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury.

Dated: September 26, 2014       Respectfully submitted,

BAUM HEDLUND ARISTEI & GOLDMAN, P.C.

Of Counsel
Frances M. Phares, Louisiana Bar No. 10388
606 East 16th Avenue
Covington, LA 70433
Tel: 985-898-6372
Fax: 985-898-0655
fphares@baumhedlundlaw.com


Mark Schlein, Trial Counsel
The Florida Bar No. 000700
mschlein@baumhedlundlaw.com
(*Pro Hac Application to be submitted*)
Diane Marger Moore, Louisiana Bar No. 9266
dmoore@baumhedlundlaw.com
(*Pro Hac Application to be submitted*)
BAUM HEDLUND ARISTEI & GOLDMAN, P.C.
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Tel: 310-207-3233
Fax: 310-207-4204

*Attorneys for Relator Treci McNeil*